Donald DAVIS, Appellant

v.

**FISK ELECTRIC COMPANY, Fisk Technologies, and Fisk Management Inc., Appellees.**

No. 14–04–00790–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 12, 2006.

574

Renuka Vinchurkar Jain, Houston, for appellants.

Kyle Wayne Sanders, J. Cary Gray, Houston, for appellees.

Panel consists of Chief Justice HEDGES and Justices YATES and ANDERSON.

## OPINION

LESLIE BROCK YATES, Justice.

Appellant Donald Davis sued appellees Fisk Electric Company, Fisk Technologies, and Fisk Management Inc. ("Fisk") for wrongful termination, alleging that his termination was based on race. A jury found that race was not a motivating factor in Davis's termination. In five issues, Davis complains that (1) the trial court erred in overruling Davis's objections to Fisk's peremptory strikes on the basis that they were exercised in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), (2–3) the evidence is legally and factually insufficient to support the verdict, (4) the trial court erred in four of its evidentiary rulings, and (5) the trial court erred in denying Davis's post-trial motion for sanctions based on discovery violations. We affirm.

### FACTUAL AND LEGAL BACKGROUND

Fisk is in the business of installing cable for construction projects. Davis worked on Fisk projects for several years as a union employee until he accepted an entry-level management position with Fisk in August 2000. Fisk undertook a project at Goodson Middle School ("Goodson"), which was scheduled for completion by June 4, 2001. Harry Stein was the project manager for this and several other Fisk projects, and Davis was assigned to be the assistant project manager. Because of demands on his time from the other projects, Stein was unable to closely monitor the work at Goodson, and so Davis, who had only one project, was placed in charge in Stein's absence.

By all accounts, the Goodson project turned out to be a total disaster. The project was mismanaged, over budget, behind schedule, and rife with errors, resulting in costly and time-consuming repairs. Fisk ended up going $40,000 over budget on this $100,000 project. In mid-May 2001, Stein learned there were problems with Goodson and became concerned that the project could not be completed on time. Consequently, Stein went for help to Charles Blanton and Matt Kenjura, two assistant vice presidents for Fisk, who had not previously been involved with Goodson. Kenjura asked Blanton and Stein to further investigate, and soon thereafter they walked through the project. After the walk-through, Blanton called the project "the biggest travesty [he had] ever witnessed in the data cabling business." Stein agreed with Blanton's assessment and, according to Blanton, asked for a new assistant project manager. Davis was re-

located to the office to handle paperwork and was terminated about three weeks later. The project foreman, George Thomas, who, like Davis, is African–American, was terminated as well. Stein, who is caucasian, was reprimanded.

Davis was given a termination letter detailing the problems with the Goodson project that led to his termination. Davis claimed he was not responsible for any of the project's deficiencies. Instead, he blamed Thomas for not properly monitoring the daily progress of the job and Stein for not providing the manpower and other assistance Davis claims he needed. Davis concluded that his termination was racially motivated and, after filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), sued Fisk for race discrimination under the Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB.CODE ANN. § 21.051 (Vernon 1996), and 42 U.S.C. § 1981 (2000).[1]

Before the trial court entered its final judgment, Davis filed a post-trial motion for sanctions, alleging that Davis had learned for the first time during trial that Fisk had falsified some of its discovery responses. The trial court entered its final judgment on May 21, 2004 and then signed a separate order denying Davis's motion for sanctions on June 24, 2004. Davis appeals from both of these orders.

## ANALYSIS

### Legal and Factual Sufficiency

In his second and third issues, Davis challenges the legal and factual sufficiency of the evidence to support the jury's verdict. When a party attacks the legal sufficiency of the evidence supporting an adverse finding as to an issue on which it has the burden of proof, the party must demonstrate on appeal that the evidences establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001). In making this determination, we examine the record for evidence that supports the finding, while ignoring all evidence to the contrary. *Id.* We will sustain the challenge only if the contrary proposition is conclusively established. *Id.*

When a party attacks the factual sufficiency of the evidence supporting an adverse finding as to an issue on which it has the burden of proof, the party must demonstrate on appeal that the finding is against the great weight and preponderance of the evidence. *Id.* at 242. In conducting a factual sufficiency review, we consider and weigh all the evidence and can set aside the verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong or unjust. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). We may not substitute our own judgment for that of the trier of fact, even if we would reach a different answer on the evidence. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

---

1. In a wrongful termination case based on race, the liability standards under both the TCHRA and § 1981 mirror Title VII of the Civil Rights Act of 1967, 42 U.S.C. § 2000e *et seq.* (2000 & Supp. II 2002). *See Pratt v. City of Houston*, 247 F.3d 601, 606 n. 1 (5th Cir. 2001); *Winters v. Chubb & Son, Inc.*, 132 S.W.3d 568, 574 (Tex.App.-Houston [14th Dist.] 2004, no pet.). For this reason, and because the parties have not argued that any unique aspect of § 1981 should alter our analysis, we will focus on the TCHRA.

In a race discrimination case under the TCHRA, it is the employee's burden to prove race was "a motivating factor" in the employer's decision to terminate. *Wal–Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex.2003). The jury found that Davis had not met this burden. Davis alleges the evidence is insufficient to support a finding that race was not a motivating factor in his termination, pointing primarily to evidence that (1) Blanton, whom he contends was the decision maker, used a racial epithet in close temporal proximity to the termination decision and (2) Fisk's reason for terminating him was false.

Davis contends that Blanton is a racist who decided to terminate him because of his race and then took steps to conceal his racism and make the reasons for Davis's termination appear legitimate. At trial, Stein testified that after he and Blanton returned from walking through the project and witnessing its vast problems, Blanton said he was going to terminate Davis. In response, Stein told Blanton that the problems at Goodson were his fault, not Davis's, and that if anyone deserved termination, it was Stein. Stein, who had apparently previously been accused of racism after terminating a minority employee, warned Blanton that since he did not have grounds for termination and since Davis was African–American, Davis might complain to the EEOC if Blanton terminated him. Stein said that Blanton referred to Davis as a "n_____" and said Davis would be terminated, although Stein could not recall the exact statement. Davis also introduced evidence that Blanton used racial slurs outside the workplace.

According to Davis, after Stein warned Blanton that he did not have grounds for terminating Davis, Blanton removed Davis from the project and then spent the next three weeks building a case to terminate Davis and covering for his discrimination. Stein testified that Blanton wrote Davis's termination letter in which he detailed the problems at Goodson. According to Stein, Blanton said he was also giving Stein a detailed disciplinary letter only to appear fair if Davis filed an EEOC complaint. Similarly, Stein claimed that Blanton rehired George Thomas, the African–American project foreman, only to appear fair if Davis contacted the EEOC. Davis, Stein, and Elliott Avery, a senior project manager and chief estimator for Fisk, testified that Davis was not responsible for the failures at Goodson and that Davis did what he could in his limited capacity as assistant project manager to make the project successful. Davis contends that Blanton actually made the project worse before his termination by assigning Raymond Garcia, a project supervisor, to Goodson and allowing Garcia to run up over $18,000 in labor costs over one weekend when the project was already over ninety percent complete. According to Davis, this evidence establishes as a matter of law that Fisk's reason for terminating him was false and that race was a motivating factor, or at least that the jury's finding to the contrary was against the great weight and preponderance of the evidence.

Fisk presented evidence disputing Davis's account of his termination. According to Blanton, Stein requested a new assistant project manager after the walkthrough revealed the extensive problems at Goodson, which Stein blamed largely on Davis. Blanton and Kenjura testified that Kenjura agreed to deal with the Goodson situation because Kenjura had hired Davis. Kenjura transferred Davis from working at the project site to doing paperwork in the office. Kenjura asked Garcia to gather more information on the status of Goodson, and they concluded that the project was not over ninety percent complete, as Davis had represented, but closer to sixty

or seventy percent complete, and the project deadline was only a few weeks away. Kenjura authorized Garcia to bring in extra help and work extensively over one weekend in an attempt to put the project back on track. According to Kenjura, this additional effort allowed the project to be completed on time, thereby avoiding a late penalty.

Kenjura testified that he was the first to recommend that Davis be terminated and that he based this recommendation on Davis's poor performance on this and other projects, in conjunction with his failure to take any responsibility for the problems at Goodson. Both Kenjura and Blanton testified that Davis, as assistant project manager, was the highest-ranking Fisk employee who was on-site on a regular basis and that Davis was responsible for ensuring that the work was done properly. This testimony was corroborated by several other witnesses, including Stein and Avery, who admitted on cross-examination that Davis had at least some responsibility to ensure the job was done right. Blanton testified that he agreed with Kenjura that Davis should be terminated but thought they should wait until after Goodson was finished because Davis knew the project best and could assist in its completion. Because he had hired Davis, Kenjura was the primary decision maker, and when Clayton Sellers, a Fisk vice president and superior of both Blanton and Kenjura, did not overrule Kenjura's recommendation to terminate Davis immediately, the termination went forward. Because Blanton's job included handling personnel issues, he drafted the termination letter and other termination paperwork.

Blanton's testimony contradicted nearly all of Stein's testimony regarding their conversations about Davis. Blanton denied recommending termination immediately upon returning from the Goodson walk-through or giving Stein a disciplinary letter only to conceal his racism toward David from the EEOC. According to Kenjura and Blanton, Stein did not say that he opposed the termination or that he should be terminated instead of Davis. When Blanton sought Stein's input on a draft of Davis's termination letter, Stein said that Fisk should be careful in its dealings with Davis because he might file a discrimination complaint with the EEOC. Blanton became angry that Stein injected race into the discussion when race had nothing to do with Davis's termination. Although Blanton said he cannot recall whether he used the word "n＿＿＿" in his conversation with Stein, he contends that even if he did, the only motivating factor for his actions was Davis's performance, not his race. Indeed, Stein said he could not remember the exact context of Blanton's statement, but one possible interpretation was something like, "Even if Davis is a n＿＿＿, that does not mean we cannot terminate him." Blanton also denied following Stein's suggestion to rehire Thomas to defend against an EEOC charge, claiming instead that he rehired Thomas to improve Fisk's relations with Thomas's union, which was protesting the termination. Finally, Blanton denied making the project worse to manufacture a basis for Davis's termination or basing Davis's termination on problems that occurred after Davis left. Rather, the termination letter was based on what Blanton saw at the walk-through, which occurred before Davis was replaced.

The jury heard substantial and conflicting evidence on nearly every relevant fact, and it was the jury's role to determine which version of events to believe. We conclude that the evidence is legally and factually sufficient to support the jury's finding that race was not a motivating factor in Fisk's decision to terminate Davis's employment. We overrule Davis's second and third issues.

### Batson Challenge

Fisk exercised five of its six peremptory challenges on African–American jurors, leaving only one African–American juror on the panel ultimately selected. Davis alleged that these five peremptory challenges were racially motivated and therefore improper under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The trial court overruled Davis's *Batson* objections. In his first issue, Davis contends the trial court "refused to allow him to demonstrate the falsity of Fisk's reasons" and erred in overruling his *Batson* objections.

■ Resolution of a *Batson* challenge involves a three-step process. First, the opponent of the peremptory challenge must establish a prima facie case of racial discrimination. The burden then shifts to the party exercising the strike to articulate a race-neutral explanation. Finally, the trial court must determine whether the opponent of the strike has proven racial discrimination. *See Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995); *Goode v. Shoukfeh*, 943 S.W.2d 441, 445 (Tex.1997). "Because the party challenging the peremptory strikes has the ultimate burden of persuasion, we conclude that the trial court should provide the party challenging the strikes ... a reasonable opportunity to rebut the race-neutral explanations." *Goode*, 943 S.W.2d at 452 (citations omitted). Davis claims the trial court did not follow this procedure because it did not allow him an opportunity to rebut Fisk's reasons.

■ Davis made his *Batson* objections, and the trial court then allowed Fisk to articulate its race-neutral reasons for striking each juror. After Fisk offered its explanation for striking the first juror, the trial court found that Fisk had proven a race-neutral reason for the strike and overruled the objection. Davis's counsel then asked "to say something, just to preserve the record," and the trial court asked her to wait until Fisk had finished offering all its explanations. Fisk then explained each of its four other strikes, and the trial court overruled the *Batson* challenge to each one. The trial court then gave Davis an opportunity to "make [a] bill," and Davis's counsel gave a brief argument as to each juror to rebut Fisk's race-neutral reasons. The trial court then reiterated its ruling that Fisk's strikes were not racially motivated and again overruled the *Batson* objections. The trial court then asked, "Anything else before we continue?," and Davis's counsel responded, "Nothing on Batson."

■ Davis did not timely object to the trial court's alleged failure to follow proper *Batson* procedure. *Batson* challenges are subject to ordinary rules of procedural default, and it was Davis's duty to bring the alleged error to the trial court's attention when the trial court was in a position to remedy the situation. *See Brumfield v. Exxon Corp.*, 63 S.W.3d 912, 919 (Tex. App.-Houston [14th Dist.] 2002, pet. denied); *Flores v. State*, 33 S.W.3d 907, 926 (Tex.App.-Houston [14th Dist.] 2000, pet. ref'd). Davis claims that his counsel attempted to object but was interrupted by the trial court. However, Davis's counsel "never attempted to later articulate a clear objection that would sufficiently apprise the trial court of the specific complaint." *Yazdi v. Republic Ins. Co.*, 935 S.W.2d 875, 879 (Tex.App.-San Antonio 1996, writ denied). The record is clear that the trial court did not know Davis was alleging improper *Batson* procedure until the hearing on Davis's motion for new trial. Because Davis did not timely object to the trial court's alleged failure to hold a proper *Batson* hearing, he has waived this argument on appeal. *See Brumfield*, 63

S.W.3d at 917, 919; *Flores,* 33 S.W.3d at 926.

■ Even if Davis had preserved error on this issue, we conclude the trial court conducted a proper *Batson* hearing. The trial court gave Davis a full opportunity to make any arguments on the *Batson* issue, and when the trial court asked if the parties had anything else to say before they continued, Davis's counsel replied, "Nothing on Batson." Davis complains that the trial court ruled before hearing his arguments. The trial court made a ruling and then, after expressly considering Davis's arguments, reiterated its prior ruling. That the trial court allowed argument after ruling but was not persuaded to change its ruling does not vitiate the hearing Davis was given. *See Thottumkal v. McDougal,* No. 14-03-00807-CV, 2004 WL 1607649, at *2 (Tex.App.-Houston [14th Dist.] July 20, 2004, pet. denied) (mem.op.).

■ We now turn to the substance of Davis's *Batson* claim. In a civil case alleging a *Batson* violation, we review the trial court's decision for an abuse of discretion. *Goode,* 943 S.W.2d at 446. A trial court abuses its discretion if its actions are arbitrary, unreasonable, or without reference to guiding rules or principles. *Id.* We will not substitute our judgment for that of the trial court in its resolution of factual issues underlying its decision. *Id.* Because the Texas criminal jurisprudence on *Batson* issues is much more developed

than the civil jurisprudence, we may look to criminal cases for guidance. *Id.* at 450.

■ On appeal, Davis makes detailed arguments challenging each one of Fisk's strikes of African–American jurors, including comparing those jurors to white jurors who were not struck.[2] Both parties "are allowed to raise, for the first time on appeal, arguments to rebut or support, respectively, the race-neutral explanations given at trial, provided that the evidence necessary to support those arguments was developed in the record." *Francis v. State,* 909 S.W.2d 158, 163 (Tex.App.-Houston [14th Dist.] 1995, no pet.). This includes developing comparisons between jurors who were not struck. *See Young v. State,* 826 S.W.2d 141, 146 (Tex.Crim.App. 1991); *Contreras v. State,* 56 S.W.3d 274, 280 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd).

### *Juror No. 5, Michael Pickett*

■ During voir dire, Michael Pickett said that he had been discriminated against in the past but that he nonetheless believed he could be fair and unbiased. He also indicated that although he would still listen to all the evidence regarding the reason for Davis's termination, the fact that Blanton had used the word "n_____" was "a real big problem." In the *Batson* hearing, Fisk's counsel explained that he struck Pickett because of his prior experience with discrimination and because he was one of the jurors with the strongest

---

**2.** Fisk shuffled the jury before voir dire. Seven of the twelve African–Americans on the panel were in the top twenty-five of the forty panelists when Fisk shuffled. Based on this fact alone, Davis asserts that "Fisk's decision to shuffle the jury was based solely on its visual appearance" and therefore, under *Miller-El,* erodes the credibility of Fisk's assertion that its strikes were race-neutral. *See Miller-El v. Dretke,* — U.S. —, ———, 125 S.Ct. 2317, 2332-33, 162 L.Ed.2d 196 (2005). The Court in *Miller-El* held that the prosecutor's shuffles were a factor suggesting discrimination not only because of the predominant number of African–Americans at the front of the panel but also because the prosecution delayed making its objection to the defense's shuffle until after the racial composition of the panel was revealed and the district attorney's office had admitted it had previously shuffled juries to manipulate their racial composition. *See id.* at 2333. There is no such additional evidence in this case.

reactions to the use of the "n_____" word. Fisk's counsel claimed that Pickett laughed when a white juror made a comment about having an African–American friend. Finally, Pickett is a musician at a church, which Fisk's counsel believed might make him susceptible to layoffs and thus not a good defense juror in a termination case.

■■■■ Davis argues that Fisk impermissibly targeted Pickett and the African–American jurors generally by asking race-related questions to elicit responses that would serve as bases to strike them. For example, Fisk asked which jurors had suffered "the sting of racial discrimination" and solicited their response to the allegation that Blanton had used the "n_____" word. Disparate questioning can be evidence of pretext. *See Miller–El v. Dretke,* 545 U.S. 231, —— ––——, 125 S.Ct. 2317, 2333–38, 162 L.Ed.2d 196 (2005). However, Fisk asked these questions of the entire panel, not only of the African–American jurors. Further, it was Davis, not Fisk, who initiated a discussion of race during voir dire. In race discrimination cases, race is an inevitable part of the trial. In such cases, jurors' racial views are relevant and may be explored during voir dire, even if African–American jurors are more likely to have racial views one party may find more or less favorable. *See Georgia v. McCollum,* 505 U.S. 42, 59, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) ("[T]here is a distinction between exercising a peremptory challenge to discriminate invidiously against jurors on account of race and exercising a peremptory challenge to remove an individual juror who harbors racial prejudice."); *Gerber v. State,* 845 S.W.2d 460, 466 (Tex.App.-Houston [1st Dist.]. 1993, pet. ref'd) (holding that striking juror because of fear she may identify with the victim is a "case-related, race-neutral explanation"). Thus, in this case, questions about jurors' personal experiences with discrimination and reactions to the use of the word "n_____" were legitimate and can properly serve as a basis for exercising peremptory challenges.

■■■■ Davis also argues that Fisk cannot rely on reasons for strikes based on nonverbal responses from jurors that are not reflected in the record through specific detailed evidence. We reject this argument. Fisk's counsel explained at the *Batson* hearing that he struck Pickett because he laughed when a white juror said he had an African–American friend and because he had a strong reaction to the "n_____" word issue. Fisk's counsel also said he struck other jurors based on similar nonverbal cues. Davis's counsel did not dispute these occurrences but instead asserted that no evidence in the record supported Fisk's counsel's claim. However, "[a] counsel's statement about an occurrence in the courtroom, which was made for purposes of the record, recorded by the court reporter, undisputed by the opposing counsel, and unquestioned and unqualified by the judge in whose presence the statement was made, establishes the occurrence for purposes of the appellate record." *Yarborough v. State,* 947 S.W.2d 892, 895 (Tex.Crim.App.1997). Under these circumstances, counsel's observations alone constitute valid proof of the matter asserted. *See id.* at 894–95; *Contreras,* 56 S.W.3d at 280.

■■■■ "Much of the voir dire decision process does turn upon intangibles and interpretation of non-verbal behavior. Not every explanation of a strike on such basis can be summarily disbelieved." *Munson v. State,* 774 S.W.2d 778, 780 (Tex.App.-El Paso 1989, no pet.). It is the trial court's responsibility to scrutinize voir dire and the jurors' demeanor carefully in assessing the legitimacy of the reason given for the strike, and we accord great deference to

the trial court's determination. *See Peetz v. State*, No. 14–04–00642–CR, 180 S.W.3d 755, 759–60 (Tex.App.-Houston [14th Dist.] 2005, no pet. h.); *Lewis v. State*, 852 S.W.2d 667, 670–71 (Tex.App.-Houston [14th Dist.] 1993, no pet.). Here, the trial judge specifically noted that he had taken notes and observed the jurors' demeanor on a number of questions, including Fisk's race-related questions. Fisk's counsel's uncontradicted assertions, supported by the trial court's observations, constitute valid proof of the nonverbal bases for striking Pickett and the other jurors in this case, who will be discussed in turn below.

Finally, Davis disputes Fisk's counsel's rationale for striking Pickett based on his employment as a musician. Davis contends no evidence supports Fisk's reasoning that musicians are more likely to be laid off and that relying on such stereotypes without evidence specifically linking the stereotype to Pickett is an impermissible group bias that suggests pretext. *See Whitsey v. State*, 796 S.W.2d 707, 714 (Tex. Crim.App.1989). The group bias theory applies when, for example, counsel strikes a teacher based on a belief that all teachers are liberal. *See id.* at 716. That differs from this case in which Pickett was struck because of a characteristic of the job itself rather than a stereotype about people who hold such a job.

Davis points out that several white jurors who were unemployed or had been terminated were not struck. "The decision to strike a particular venireperson is not susceptible to rigid quantification; rather, it is a fluid process, often hinging on the interaction of a number of variables and permutations." *Cantu v. State*, 842 S.W.2d 667, 689 (Tex.Crim.App.1992). Disparate treatment cannot automatically be imputed in every situation in which one of counsel's reasons for striking a juror

would technically apply to another juror who was not struck. *See id.; Contreras*, 56 S.W.3d at 280. While jurors are not "cookie cutters" and need not have identical characteristics to create a basis for comparison, the trial court should evaluate together all reasons for the strike and determine whether differences between jurors are significant. *See Miller–El*, 125 S.Ct. at 2329 & n. 6; *Cantu*, 842 S.W.2d at 689. In this case, though other jurors had past employment issues, they did not also feel they had been discriminated against, express a very strong reaction to the "n____" word issue, or laugh when a white person said he had an African-American friend. These significant differences provided a race-neutral basis for distinguishing Pickett from other jurors.

The trial court's decision to deny Davis's *Batson* challenge to Fisk's strike of Pickett is reasonable and supported by the record. Thus, we find no abuse of discretion.

### *Juror No. 9, Euline Edmund*

In an employment discrimination case, an employer's anti-discrimination policies are relevant to punitive damages. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). Therefore, Fisk's counsel questioned how jurors felt about Fisk's policies in relation to Blanton's use of the word "n____." Euline Edmund said, "Well, having a policy is one thing; but actually implementing the policy is another thing. If [Blanton] is still employed, and depending on how long he's been doing this, that would definitely sway me." Fisk's counsel struck Edmund because of counsel's belief, based on this answer, that she would be plaintiff-oriented on punitive damages. He also observed that Edmund was one of the jurors with the strongest feelings on the use of the "n____" word, citing her admission that she "would have a real hard time" listening to the evidence because she

was so offended. Finally, he noted that Edmund indicated she agreed with the notion that whether a company had other African–American employees was irrelevant to racism.

■ These are legitimate reasons for Fisk's counsel striking Edmund. Striking because of an unfavorable position on punitive damages or a defense theory is race-neutral. *See Hatchett v. State,* 930 S.W.2d 844, 846 & n. 1 (Tex.App.-Houston [14th Dist.] 1996, pet. ref'd) (noting that unfavorable position on punishment issue was legitimate basis for striking jurors). Fisk's counsel's unchallenged observations are evidence of her nonverbal reactions regarding the relevance of other African–American employees and the use of the "n____" word, as did Edmund's admission that she would have a hard time listening to the evidence because Blanton had used that word. Davis points out that a white juror also said the use of the "n____" word would make it difficult to listen to the evidence; however, this juror did not also express an unfavorable view on punitive damages and openly oppose the theory that other African–American employees are relevant to a company's alleged racism. These differences are significant and directly related to the case. Thus, the trial court did not abuse its discretion in rejecting Davis's *Batson* challenge regarding Edmund.

### *Juror No. 12, Patrick Daigle*

■ Patrick Daigle works for Continental Airlines. He explained during voir dire that he serves as a liaison between management and employees when em-

ployees have complaints, and he assists in resolving those complaints. Some complaints involve allegations of race discrimination, although he has never personally handled one. Daigle emphasized that he did not think this experience would cause him to favor Davis and that he could be fair. Fisk's counsel explained that he struck Daigle because Daigle seemed "too ready to believe" that his employer has discriminatory employment practices. Also, Fisk's counsel claimed that Daigle's reactions to questions on the issue of punitive damages indicated to him that Daigle was "most clear" that "corporations should be punished with the use of punitive damages."[3]

■ Davis complains that the record does not indicate Daigle was biased toward punitive damages, but, as explained above, Fisk's counsel's uncontradicted statement to the contrary during the *Batson* hearing alone constitutes evidence. Davis contends that striking Daigle based on his liaison job is improper because Daigle repeatedly said he would be fair. However, counsel is not required to take all voir dire answers at face value. Counsel "may base peremptory challenges on … legitimate hunches and past experiences so long as racial discrimination is not the motive." *Frazier v. State,* 909 S.W.2d 255, 258 (Tex.App.-Houston [14th Dist.] 1995, no pet.); *see also Purkett,* 514 U.S. at 768, 115 S.Ct. 1769 (noting that reasons for a strike may be "silly or superstitious" as long as they are race-neutral). Finally, Davis argues that Fisk's counsel engaged in disparate questioning because he asked Daigle if he was related to one of counsel's other clients but did not also question a

---

**3.** Daigle also stated in voir dire that a former employer had discriminated against him. Though Fisk cited this as a reason for its strike in its brief, Fisk's counsel did not present this reason to the trial court during the *Batson* hearing. Davis argues that Fisk there-

fore waived this argument. We need not decide whether Fisk can assert this completely new reason for the first time on appeal because we conclude that the trial court did not abuse its discretion in allowing Fisk's strike based on the reasons given at trial.

white juror who was an employee of a client grocery store. Daigle answered that he was not related to that client, and Fisk's counsel did not cite Daigle's answer as a basis for the strike. Thus, any disparity in questioning is not evidence of pretext in this situation. *See Miller–El v. Cockrell*, 537 U.S. 322, 344, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("[I]f the use of disparate questioning is determined by race at the outset, it is likely a justification for a strike based on the resulting divergent views would be pretextual."). We conclude the trial court did not abuse its discretion in denying Davis's challenge as to Daigle.

### Juror No. 18, Leon Randle

 Leon Randle is a warehouse custodian with a high school education. At the *Batson* hearing, Fisk's counsel stated that given Randle's education and employment, he feared Randle would not be able to grasp some of the complexities of Fisk's defense. Also, Fisk's counsel had obtained a substantial judgment against Randle's employer and was concerned that Randle might be aware of the litigation. Finally, Fisk's counsel noted that Randle had been terminated from a previous job.[4]

 Davis argues that Fisk's reference to Randle's education is vague because he was not questioned on the subject and

because other jurors with only a high school education were not struck. However, Fisk points out that Randle misspelled four words on his juror information card, including his own job position.[5] Poor literacy skills is a legitimate basis for striking a juror. *See Barnes v. State*, 855 S.W.2d 173, 174 (Tex.App.-Houston [14th Dist.] 1993, pet. ref'd). Though other jurors may have had the same amount of formal education, there is no indication they had similar literacy problems. Davis also complains that because Fisk's counsel did not question Randle about his knowledge of the prior judgment against his employer, using it as a basis for a strike suggests discrimination. However, Fisk's counsel did not question Randle because doing so risked creating the very prejudice Fisk wanted to avoid. We find no error in the trial court's decision to deny Davis's *Batson* challenge as to Randle.

### Juror No. 21, Mary Harts

 Mary Harts is a physical therapist. Fisk's counsel questioned her about whether her occupation would make her more sympathetic to Davis's claims for emotional distress. Harts explained that she would be empathetic but not sympathetic. When Harts described her job and prior experiences of discrimination, Fisk's counsel became concerned that Harts was

---

**4.** Fisk's counsel also stated at the *Batson* hearing that Randle had nonverbally indicated that he had experienced discrimination. In its appellate brief, Fisk acknowledges this was probably a mistake in counsel's notes. In this case, particularly given the combination of legitimate reasons for striking Randle, such a discrepancy does not suggest discrimination. *See Francis*, 909 S.W.2d at 164 (noting that in a *Batson* hearing, counsel "work from limited notes jotted quickly in a small space" and that small discrepancies based on these notes do not "amount to a pretense on their face"); *see also Gibson v. State*, 144 S.W.3d 530, 533–34 (Tex.Crim.App.2004) (stating that courts are to examine "the genu-

ineness instead of reasonableness" of reasons given for the strike).

**5.** Davis argues that because Fisk's counsel did not point out these misspelled words during the *Batson* hearing, he may not do so now on appeal. However, this information supports Fisk's trial argument regarding Randle's education. Both sides are allowed to raise new arguments on appeal that support the reasons given at trial as long as the underlying evidence was in the record, as were the juror information cards here. *See Francis*, 909 S.W.2d at 163.

unhappy with her job. After questioning her at the bench, he learned that Harts was actually satisfied with her job. Fisk's counsel struck Harts because he was concerned that, based on her job, she would be more likely to believe Davis's emotional distress claims. She also had laughed when a white juror claimed to have an African–American friend and had reacted strongly to the "n____" word issue. Fisk's counsel was also bothered that Harts was quiet during most of voir dire. Finally, Fisk's counsel felt compelled to strike Harts because he had singled her during voir dire and believed she might hold that against Fisk.

Davis complains Fisk lacks evidence of the nonverbal bases for striking Harts, but, as explained above, counsel's uncontradicted statements regarding her cues are sufficient evidence. Davis points to Harts's statements that she did not sympathize with Davis, but Fisk was entitled to question that response, especially in light of her comment that she would empathize with Davis. Fisk's counsel did not ask many direct questions of Harts in voir dire, and Davis argues that Fisk cannot thereby use Hart's silence as a basis for striking her. However, Harts had the opportunity to speak, as did the other jurors, and her perceived silence is a race-neutral reason for striking her. *See Barnes,* 855 S.W.2d at 174 ("The State may also strike a prospective juror who appears inattentive during the voir dire process."). The trial court did not abuse its discretion in allowing Fisk's counsel to strike Harts.

We have determined that the trial court did not abuse its discretion in denying Davis's *Batson* challenge to the five strikes at issue, and thus we overrule appellant's first issue.

### Evidentiary Rulings

In his fourth issue, Davis claims the trial court erred in four evidentiary rulings, the cumulative effect of which resulted in an improper verdict. We review a trial court's evidentiary rulings for an abuse of discretion. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex. 1995). A trial court abuses its discretion if it acts unreasonably or without reference to any guiding rules or principles. *Id.*

### 1. Elliot Avery

One of Davis's trial theories was that Fisk targeted African–American employees for termination. Davis called Elliot Avery, who testified that Davis was not responsible for the problems at Goodson and that he believed Davis's termination was racially motivated because he was "set up to fail." Fisk sought to discredit Davis's theory that it targeted African–Americans for termination by showing that Avery, who is also African–American, had been accused of three instances of serious misconduct and yet had not been terminated.

■■■■■ Davis objected, arguing that Fisk was attempting to discredit Avery through prior acts of misconduct in violation of Texas Evidence Rules 404(b) and 608. The trial court overruled Davis's objection and granted him a running objection to "this entire line of questioning." Fisk proceeded to question Avery on his prior misconduct and later questioned Kenjura and Blanton on these same issues. Davis did not renew his prior objection during either Kenjura's or Blanton's testimony. "A running objection when requested by [counsel] and granted by the trial court does not preserve error when another witness testifies to the same matter without objection." *Scaggs v. State,* 18 S.W.3d 277, 292 (Tex.App.-Austin 2000, pet. ref'd); *see also Sattiewhite v. State,* 786 S.W.2d 271, 283 n. 4 (Tex.Crim.App. 1989) ("We found no support in the case

law for a proposition that a running objection on a particular matter would preserve error *whenever that matter was brought up again in the trial,* and regardless of what witness brought it up or what time it was brought up."); *Ross v. State,* 154 S.W.3d 804, 811–12 (Tex.App.-Houston [14th Dist.] 2004, pet. filed) (finding running objection during one witness's testimony "relieved [defendant] of having to reassert his objection while [witness] testified" but did not preserve error regarding additional testimony on the same subject from other witnesses). Thus, any error in allowing Avery to be questioned regarding prior misconduct was waived by Davis's failure to object to testimony about the misconduct by subsequent witnesses. *Leday v. State,* 983 S.W.2d 713, 718 (Tex. Crim.App.1998); *Ross,* 154 S.W.3d at 812.

### 2. Stephen Janacek

■ Fisk terminated Davis's employment on June 12, 2001. From October 2001 to March 2002, Davis worked in the construction business at a company called Encompass. Davis's separation papers show he was laid off from Encompass. Fisk presented testimony from Stephen Janacek, Davis's supervisor at Encompass, who testified that Davis's work there was unsatisfactory but that Encompass chose to lay him off rather than terminate him because it feared being sued. Fisk argued that this evidence was relevant to show that Davis failed in his duty to maintain subsequent employment. The trial court agreed and admitted the evidence.

■ Davis claimed damages for lost wages, and a plaintiff seeking damages in a termination suit has a duty to mitigate damages not only by seeking substantially similar employment after termination but also by reasonably maintaining that employment. *See Patterson v. P.H.P. Healthcare Corp.,* 90 F.3d 927, 936 (5th

Cir.1996) (noting that the duty of mitigation necessarily "includes an obligation 'to make reasonable and good faith efforts to maintain that job once accepted' " and finding that employee who was fired from a subsequent job for his own misconduct did not meet that duty); *see also Deffenbaugh–Williams v. Wal–Mart Stores, Inc.,* 156 F.3d 581, 591 (5th Cir.1998) (" '[I]t necessarily follows that the claimant must also use reasonable diligence in maintaining that substantially similar employment.' "); *Coastal Mart, Inc. v. Hernandez,* 76 S.W.3d 691, 698 (Tex.App.-Corpus Christi 2002, pet. dism'd by agr.) ("A wrongfully discharged employee has a duty to mitigate damages by making a good faith effort to obtain and retain employment.").

Davis argues that the trial court abused its discretion in admitting Janacek's testimony, claiming it was not relevant to the issue of mitigation because he exercised diligence in finding employment with Encompass and maintained that employment until he was laid off. However, the trial court reasonably concluded that evidence that Davis lost his job at Encompass because of poor performance showed he failed in his duty to maintain substantially similar employment. Davis also argues that Janacek was not a designated corporate representative of Encompass and thus could not contradict the official explanation that Davis was laid off rather than terminated. Davis cites no authority for this theory, and Janacek was Davis's supervisor and testified to his direct knowledge of Davis's performance and the rationale behind Encompass's decision-making process. The trial court did not abuse its discretion in admitting Janacek's testimony.

### 3. Anti–Discrimination Policy

■ Davis next argues that the trial court erred in admitting testimony and

documentary evidence of Fisk's anti-discrimination policy because that policy was not produced during discovery. At trial, Davis primarily argued that the policy was not relevant to any issue in the case and also stated simply that "[i]t was not produced." In his brief, Davis identifies a specific discovery request and explains why Fisk should have produced its anti-discrimination policy in response. However, he failed to explain this specific basis for his objection to the trial court, and his general objection that "[i]t was not produced" preserves nothing for our review. *See* TEX.R.APP. P. 33.1(a); *Rogers v. State,* 756 S.W.2d 332, 342 (Tex.App.-Houston [14th Dist.] 1988, pet. ref'd).

### 4. Corporate Identity

 Tyco owns Fisk, but Tyco was not a party to the suit. The trial court prohibited Davis from referring to Tyco. Davis argues this was an abuse of discretion because he claims that when he accused Blanton of racial discrimination, Blanton "threatened" him by stating, "Well, this is Tyco now and not Fisk." Davis claims this alleged threat was an "operative fact" that should have been admitted. The trial court allowed Davis to repeat the statement but without referring to Tyco. The trial court noted that Tyco was not a party to the suit and was clearly concerned that any reference to Tyco would prejudice the jury against Fisk because of Tyco's recent, well-publicized financial scandals. *See Long v. State,* 130 S.W.3d 419, 427 (Tex. App.-Houston [14th Dist.] 2004, no pet.) (noting that "unfair prejudice" under Rule 403 means a tendency to suggest a decision on "an improper basis"). Basing its ruling on such considerations was well within the trial court's discretion under Texas Rule of Evidence 403.

We overrule Davis's fourth issue.

### Post–Trial Sanctions

Davis filed a post-trial motion for sanctions, arguing that Fisk should be sanctioned for alleged discovery violations revealed during trial. The trial court denied Davis's motion, and in his fifth issue, Davis claims this was error.

 A trial court has broad discretion in matters of discovery and sanctions, and we will reverse a trial court's ruling denying a motion for sanctions only for abuse of discretion. *Johnson v. Davis,* No. 14–04–00206–CV, 178 S.W.3d 230, 242 (Tex.App.-Houston [14th Dist.] 2005, no pet. h.).

 Davis claims that Fisk falsified two of its interrogatory responses. In his first interrogatory, Davis asked Fisk to identify "each person who participated in the decision to terminate" Davis and "each person who did not agree with the decision to terminate." Fisk responded that Blanton, Sellers, and Kenjura "were in collective agreement [that] the decision to terminate Mr. Davis was indeed in the best interest for the division" and that "Fisk is not aware of any person, other than [Davis], who did not agree with the decision to terminate." Davis argues that Kenjura's and Blanton's testimony that Kenjura made the termination decision and Blanton opposed it directly contradict this interrogatory response. However, the trial testimony established that Kenjura was the first to recommend termination and was the most influential in the termination process, although he did consult Blanton. Further, Blanton testified that he was in favor of terminating Davis but thought the termination should be delayed until Goodson was finished. That is consistent with the interrogatory response that Kenjura and Blanton were in "collective agreement" that termination was best and that Fisk knew of no one other than Davis who opposed the decision to terminate. The trial court did not abuse its

discretion in refusing to sanction Fisk for its response to Davis's first interrogatory.

■ Davis's nineteenth interrogatory asked Fisk to describe Kenjura's subsequent separation from employment with Fisk, including whether the separation was a termination and whether he was under investigation for misappropriation of funds or any other alleged wrongdoing. Fisk responded that Kenjura was part of a reduction in force and that "[t]here was no investigation made." At trial, Carl Taskalos, former president of Fisk Technologies, testified on cross-examination as follows:

Q. [W]as Mr. Kenjura terminated?

A. Yes, he was.

Q. So if in response to an interrogatory answer Fisk represented that Mr. Kenjura was laid off as a reduction in force and signed that statement under oath, that would be a lie?

A. I really don't know what the specific reasons were for terminating Mr. Kenjura's employment or if it was a termination or a layoff. Sometimes they can be one and the same. So I really can't answer your question.

Q. So was he terminated, or was he not terminated?

A. Well, he's no longer with the company and his employment was terminated.

. . . .

Q. Isn't it true, Mr. Taskalos, that Mr. Wade gathered evidence of financial misdeeds by Kenjura and provided that information to you?

A. He didn't provide it to me personally. I know he did generate some reports that were requested of him, but he didn't do anything on my behalf. At that point in time I was already running One Source Building technologies, which is a sister company of Fisk, and I wasn't really involved with Fisk Technologies.

. . . .

Q. Part of that investigation included at 19,000–dollar landscaping job that was charged to the Compaq project; isn't that true?

A. I heard about that, but I really don't know any details about it.

. . . .

Q. Was [sic] there two million dollars in losses discovered after Mr. Kenjura left Fisk?

A. I don't know if that was the exact number. It was a significant number.

I don't know if two million is the correct number. Davis claims this testimony proves Fisk's response to his interrogatory was false because Kenjura was investigated and then terminated, not laid off. However, Taskalos testified he was unsure whether Kenjura was terminated or laid off and had little, if any, personal knowledge of an investigation involving Kenjura. This vague testimony does not clearly establish a false interrogatory answer, and the trial court denied Davis's motion for sanctions, noting there was no indication that Fisk had engaged in any intentional misconduct sufficient to warrant post-trial sanctions. The trial court did not abuse its discretion in denying Davis's motion for sanctions based on Fisk's response to interrogatory nineteen.

We overrule Davis's fifth issue.

## Conclusion

Having overruled all of Davis's issues, we affirm the trial court's final judgment of May 21, 2004 and its order denying Davis's motion for sanctions dated June 24, 2004.