IN THE SUPREME COURT OF TEXAS








IN THE SUPREME COURT OF TEXAS
 
════════════
No. 06-0162
════════════
 
Donald Davis, 
Petitioner,
 
v.
 
Fisk Electric Company, Fisk 
Technologies &
 Fisk Management 
Inc., Respondents
 
════════════════════════════════════════════════════
On Petition for Review from the
Court of Appeals for the Fourteenth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued April 10, 
2007
 
 
            
Chief Justice 
Jefferson delivered the 
opinion of the Court, joined by Justice 
Hecht, Justice O’Neill, Justice Wainwright, Justice Medina, Justice Green, 
Justice Johnson, and Justice Willett.
 
            
Justice Brister delivered a concurring opinion, in 
which Justice Medina joined as to Part 
III.           
 
            
Our rules generally permit each party in a civil action to exercise six 
peremptory strikes, which are challenges “made to a juror without assigning any 
reason therefor.” Tex. R. Civ. P. 232, 233. But peremptories exercised for an improper reason, like race or 
gender, are unconstitutional. In this case, the African American petitioner 
asserted that he was terminated based on his race. The respondents used 
peremptory challenges at trial to exclude five of six African Americans from the 
venire but contend that their reasons for doing so had nothing to do with the 
potential jurors’ race. The stated reasons, however, when viewed in conjunction 
with the 83% removal rate and a comparative juror analysis, defy neutral 
explanation. Because we conclude that at least two of the strikes were based on 
race, we reverse in part the court of appeals’ judgment and remand the case for a new trial.
I
Factual 
Background
 
            
Donald Davis, an African American, worked for Fisk Electric Company as an 
assistant project manager. In February 2001, Fisk was awarded the contract to 
install cables at Goodson 
Middle School, in the Cypress Fairbanks School 
District. After problems arose on the Goodson 
project, Fisk terminated Davis. Davis 
asserts that his termination was based on his race, as evidenced in part by his 
supervisor’s alleged use of the “n-word” when planning Davis’s termination.
            
Davis 
sued Fisk,[1] claiming violations of 42 U.S.C. § 1981 
and the Texas Labor Code. Fisk denied liability. The case was called for trial, 
and at the conclusion of voir dire, Fisk peremptorily 
struck six venire members, five of whom were African American and all of whom 
were minorities. Davis objected, citing Batson v. 
Kentucky, 476 U.S. 79 (1986),[2] and the trial court, after a hearing, 
overruled the objection. The jury returned a defense verdict, the trial court 
signed a take-nothing judgment, and the court of appeals affirmed. 187 S.W.3d 570, 577. We granted Davis’s petition for 
review to apply the United States Supreme Court’s most recent guidance on 
peremptory challenges that are allegedly race-based. 50 
Tex. 
Sup. Ct. J. 446 (Feb. 23, 2007). 
II
Batson 
Challenge 
 
            
Davis 
raises a single complaint: that Fisk struck prospective jurors based on race, in 
violation of Batson. We last wrote on Batson challenges in 
Goode v. Shoukfeh, 943 S.W.2d 441 (Tex. 1997), and in the 
intervening years, the landscape has evolved. Significantly, after the trial in 
this case, the Supreme Court decided Miller-El v. Dretke, 545 U.S. 231 (2005) (“Miller-El II”), a 
case in which the Court concluded that a habeas petitioner was entitled to 
relief because prosecutors in his criminal trial peremptorily struck potential 
jurors based on race. Although Miller-El II is a criminal case, it 
involves many of the same factors at issue here, and we examine it in some 
detail.
            
The case began with Miller-El’s 1986 capital murder trial in a Texas trial court. During 
jury selection, prosecutors used peremptory strikes to remove ten African 
Americans from the venire. Miller-El objected that the strikes were improperly 
based on race, given the Dallas County District Attorney’s Office’s historic 
practice of excluding blacks from criminal juries. The trial court concluded 
that, under Swain v. Alabama, which was then the governing standard for 
complaints of racially based jury selection, there had been no “systematic 
exclusion of blacks as a matter of policy” by that office and thus no 
entitlement to a new jury. Miller-El II, 545 U.S. at 236 
(quoting Swain v. Alabama, 380 U.S. 202 (1965)). Miller-El was convicted 
and sentenced to death. Id. 
            
While his appeal was pending, the Supreme Court decided Batson, 
“which replaced Swain’s threshold requirement to 
prove systemic discrimination under a Fourteenth Amendment jury claim, with the 
rule that discrimination by the prosecutor in selecting the defendant’s jury 
sufficed to establish the constitutional violation.” Id. The Court of 
Criminal Appeals remanded the case to the trial court to determine whether 
Miller-El could prove a Batson violation. Miller-El 
v. State, 748 S.W.2d 459 (Tex. Crim. App. 1988) 
(en banc). 
            
The trial court reviewed the voir dire record, 
and one of the prosecutors provided his rationale for previously unexplained 
strikes. The trial court deemed the explanations “completely credible [and] 
sufficient” and found there was “no purposeful discrimination.” Miller-El 
II, 545 U.S. at 236. The Court of Criminal 
Appeals affirmed, stating that the voir dire record 
provided “ample support” for the prosecutor’s race-neutral explanations. 
Miller-El v. State, No. 69,677 (Tex. Crim. App. 
Sept 16, 1993) (per curiam), p. 2.
            
Miller-El then sought habeas relief under 28 U.S.C. § 2254, again raising 
his Batson claim. Miller-El II, 545 U.S. at 237. The 
federal district court denied relief, and the Fifth Circuit refused to certify 
appealability. Miller-El v. 
Johnson, 261 F.3d 445 (5th Cir. 2001). The Supreme Court granted 
certiorari to consider whether Miller-El was entitled to review of his 
Batson claim and, determining that “the merits of the Batson claim 
were, at the least, debatable by jurists of reason,” held that Miller-El was 
entitled to a certificate of appealability. 
Miller-El II, 545 U.S. at 237 (citing Miller-El v. 
Cockrell, 537 U.S. 322 (2003) (“Miller-El I”)). After granting that 
certificate, the Fifth Circuit rejected Miller-El’s Batson claim. Miller-El v. Dretke, 361 F.3d 849 
(5th Cir. 2004). The Supreme Court again granted certiorari, Miller-El 
v. Dretke, 542 U.S. 936 (2004), and again 
reversed, Miller-El II, 545 U.S. at 237, this time on the merits of 
Miller-El’s Batson challenge.
            
Noting that a Batson challenge requires an examination of “‘all 
relevant circumstances,’” the Court examined five factors in determining that 
jury selection in Miller-El’s criminal trial violated the Equal Protection 
Clause. Miller-El II, 545 U.S. at 240 (quoting Batson, 476 
U.S. at 96-97). The first 
involved an analysis of the statistical data pertaining to the prosecution’s 
peremptory strikes. The Court noted that prosecutors used peremptory strikes to 
exclude 91% of the eligible African-American venire members—a percentage too 
great to attribute merely to “[h]appenstance.” 
Id. at 
241. 
            
The Court then conducted a comparative juror analysis, noting that 
“[m]ore powerful than these bare statistics, however, are side-by-side 
comparisons of some black venire panelists who were struck and white panelists 
who were allowed to serve.” Id. The Court explained that “[i]f a prosecutor’s proffered reason for striking a black 
panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending 
to prove purposeful discrimination to be considered at Batson’s third 
step.” Id. In conducting this analysis, the 
Court rejected the notion that struck venire members must be compared only to 
jurors who are identical in all respects (save race): “A per se rule that 
a defendant cannot win a Batson claim unless there is an exactly 
identical white juror would leave Batson inoperable; potential jurors are 
not products of a set of cookie cutters.” Id. at 247 
n.6. The Court focused on the prosecution’s questioning of two black 
venire members—Billy Jean Fields and Joe Warren—and compared their answers to 
those given by whites. With regard to Fields, the Court determined that:
 
nonblack jurors whose remarks on rehabilitation could well 
have signaled a limit on their willingness to impose a death sentence were not 
questioned further and drew no objection, but the prosecution expressed 
apprehension about a black juror’s belief in the possibility of reformation even 
though he repeatedly stated his approval of the death penalty and testified that 
he could impose it according to state legal standards even when the alternative 
sentence of life imprisonment would give a defendant (like everyone else in the 
world) the opportunity to reform.
 
Id. at 
245. 
            
As for Warren, the Court noted that the State’s proffered reason—that 
Warren’s voir dire answers were inconsistent—seemed 
plausible, but “its plausibility [was] severely undercut by the prosecution’s 
failure to object to other panel members who expressed views much like 
Warren’s.” Id. at 
248. After comparing his answers to panel members who expressed similar 
conclusions, the Court decided that race was significant in determining who was 
challenged and who was not. Id. at 
252. The Court also rejected the court of appeals’ independent conclusion 
that Warren expressed general ambivalence about 
the death penalty, because the prosecutor’s stated reasons for striking 
Warren did not 
allude to any such ambivalence. Id. at 
250. The Court then noted:
 
[T]he rule 
in Batson provides an opportunity to the prosecutor to give the reason 
for striking the juror, and it requires the judge to assess the plausibility of 
that reason in light of all evidence with a bearing on it. It is true that peremptories are often the subjects of instinct, and it can 
sometimes be hard to say what the reason is. But when illegitimate grounds like 
race are in issue, a prosecutor simply has got to state his reasons as best he 
can and stand or fall on the plausibility of the reasons he gives. A 
Batson challenge does not call for a mere exercise in thinking up any rational 
basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, 
or an appeals court, can imagine a reason that might not have been shown up as 
false. The Court of Appeals’s and the dissent’s 
substitution of a reason for eliminating Warren does nothing to satisfy the prosecutors’ 
burden of stating a racially neutral explanation for their own actions.
 
Id. at 251-52 
(citations omitted) (emphasis added). 
            
A third factor the Court considered was the prosecution’s use of the jury 
shuffle, a practice unique to Texas,[3] and one that the Court held could 
“indicate decisions probably based on race.” Id. at 253. The Miller-El jury was shuffled some eight 
times, at the request of both the prosecution (three times) and the defense 
(five times). Miller-El II, 545 U.S. at 255 
n.14. The Court noted that “‘the prosecution’s decision to seek a jury 
shuffle when a predominant number of African-Americans were seated in the front 
of the panel, along with its decision to delay a formal objection to the 
defense’s shuffle until after the racial composition was revealed, raise a 
suspicion that the State sought to exclude African-Americans from the jury.’” 
Id. at 254 (quoting Miller-El I, 537 U.S. at 
346). This was amplified by testimony that the Dallas County District 
Attorney’s Office had previously admitted to using the shuffle to manipulate the 
racial makeup of juries. Id. The Court concluded:
 
The State 
notes in its brief that there might be racially neutral reasons for shuffling 
the jury, and we suppose there might be. But no racially neutral reason has ever 
been offered in this case, and nothing stops the suspicion of discriminatory 
intent from rising to an inference.
 
Id. at 
254-55 (citation omitted).
            
A fourth factor the Court relied on was the “contrasting voir dire questions posed respectively to black and nonblack panel members.” Id. at 255. Prosecutors gave black panel members a vivid, 
graphic account of the death penalty before asking about the member’s feelings 
on the subject, while it gave nonblacks a “bland 
description.” Id. While the State conceded that 
disparate questioning occurred, it asserted that the disparity was based on 
panel members’ differing views of the death penalty—those who expressed 
ambivalence received the “graphic script,” while those who did not received the 
watered-down version. Id. at 
256-57. Based on the record, however, the Court concluded that black 
venire members were more likely to receive the graphic script regardless of 
their expressions of ambivalence, and the State’s explanation failed for four of 
the eight black panel members who received that script. Id. at 
258. Additionally, four out of five nonblacks 
who were given the graphic script were not those who had expressed ambivalence 
but were instead unambiguously in favor of, or vehemently opposed to, the death 
penalty. Id. at 
259. The Court also noted that the State disparately used manipulative 
questioning regarding minimum punishments. Id. at 261. The State conceded that practice but argued that it 
was premised on opposition to or ambivalence regarding the death penalty, rather 
than race. Id. at 
261-62. The Court disagreed, noting that “only 27% of nonblacks questioned on the subject who expressed these 
views were subjected to the trick question, as against 100% of black members. 
Once again, the implication of race in the prosecutors’ choice of questioning 
cannot be explained away.” Id. at 
263. 
            
Finally, the Court considered the Dallas County District Attorney’s 
Office’s history of “systematically excluding blacks from juries.” Id. 
Specifically, the defense presented evidence that the DA’s office had adopted a 
formal policy to exclude minorities from jury service, and that policy was 
summarized in a “‘manual entitled ‘Jury Selection in a Criminal Case’ [sometimes 
known as the Sparling Manual]’” that was distributed 
to prosecutors. Id. (quoting 
Miller-El I, 537 U.S. at 335). Although the 
manual was written in 1968, the evidence showed it was available to at least one 
of Miller-El’s prosecutors. Id. The Court also observed that 
prosecutors had noted the race of each prospective juror on their juror cards. 
Id. 

            
Considering the totality of the circumstances, the Court held: 
 
It blinks 
reality to deny that the State struck Fields and Warren, included in [the] 91% 
[of black venire members who were struck], because they were black. The strikes 
correlate with no fact as well as they correlate with race, and they occurred 
during a selection infected by shuffling and disparate questioning that race 
explains better than any race-neutral reason advanced by the State. The State’s 
pretextual positions confirm Miller-El’s claim, and 
the prosecutors’ own notes proclaim that the Sparling 
Manual’s emphasis on race was on their minds when they considered every 
potential juror.
 
Id. at 
266. Holding that the state court’s conclusion about the prosecutors’ 
strikes of those two jurors was wrong “to a clear and convincing degree,” the 
Court reversed the court of appeals’ judgment and remanded the case for entry of 
judgment for Miller-El, “together with orders of appropriate relief.” Id. 
III
Batson 
Procedure
 
            
With this context in mind, we turn to the Batson challenge at 
issue in this case, but first address a procedural matter. Davis presented his 
Batson objection at the conclusion of voir 
dire, after both sides exercised their peremptory challenges. Fisk then defended 
its strikes, beginning with Juror No. 5, Michael Pickett. The trial court 
immediately overruled the Batson objection upon hearing Fisk’s 
explanation. Davis’s counsel asked to address Fisk’s 
reasons, “to preserve the record here.” The trial court answered: “You’ve raised 
the objection. That burden shifts. The burden has shifted. I overruled the 
objection. No. 9. Let’s move on. If you want to put 
something on the record at the conclusion of this, we can do so. No. 9?” A similar procedure was followed for Fisk’s 
justification for each of the remaining strikes. 
            
By overruling the objection before permitting Davis to rebut Fisk’s 
explanations, the trial court overlooked part of Batson’s third step.[4] See Goode, 943 
S.W.2d at 445-46. We do not doubt the trial court’s full engagement in 
the voir dire and Batson proceedings, but it 
nonetheless should have permitted Davis’s counsel to rebut Fisk’s explanations, 
rather than ruling before she had the opportunity to do so. Id. at 452 
(“Because the party challenging the peremptory strikes has the ultimate burden 
of persuasion, we conclude that the trial court should provide the party 
challenging the strikes . . . a reasonable opportunity to rebut the race-neutral 
explanations.”) (citation omitted). Davis complains of the trial court’s evading the third 
step, and the court of appeals held that Davis waived the objection by not raising it in 
the trial court. 187 S.W.3d at 581. To the contrary, 
Davis’s counsel 
specifically asked the trial court to address Fisk’s explanations for the 
strikes. The trial court refused her request but said that she could “put 
something on the record at the conclusion of this.” We conclude that Davis’s request was sufficient to advise the trial court of 
the complaint, and Davis did not waive the objection.
            
Nonetheless, the error in failing to follow proper procedure was harmless 
in this case. The trial court permitted Davis to 
make a bill after the Batson hearing, and Davis’s counsel addressed Fisk’s strikes and 
the explanations given. After listening to this argument, the trial court again 
overruled the Batson objection, “find[ing] that 
the Defense has articulated reasons, at least for their decisions on particular 
jurors on a nonrace basis for striking them.” 
IV
Standard of 
Review
 
            
In contrast to the federal system, which employs a “clearly erroneous” 
standard of review, we review a trial court’s Batson ruling for abuse of 
discretion. Goode, 943 S.W.2d at 446 (noting that “[a] trial court abuses 
its discretion if its decision ‘is arbitrary, unreasonable, and without 
reference to guiding principles’” and observing that standard is “similar, 
although not identical to,” federal “clearly erroneous” standard); cf. 
Hernandez v. New York, 500 U.S. 352, 369 (1991) (holding that a trial 
court's finding will not be disturbed unless the appellate court is “‘left with 
a definite and firm conviction that a mistake has been committed’”) (quoting 
United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948)); 
Young v. State, 826 S.W.2d 141, 144 (Tex. Crim. 
App. 1991) (noting that “[a] reviewing court should reverse [trial court’s] 
findings only when they are not supported by sufficient evidence or, as we often 
say, for an ‘abuse of discretion’”). In Miller-El II, a habeas proceeding 
governed by the standard of review set forth in the Antiterrorism and Effective 
Death Penalty Act of 1996, the Supreme Court noted that it would “presume the 
Texas court's 
factual findings to be sound unless Miller-El rebut[ted] the ‘presumption of 
correctness by clear and convincing evidence.’” Miller-El II, 545 
U.S. at 240 (citing 28 U.S.C. § 
2254(e)(1)). Like our abuse of discretion standard, 
see Goode, 943 S.W.2d at 447, the standard applied in Miller-El II 
was “demanding but not insatiable,” and “‘[d]eference does not by definition preclude relief.’” 
Miller-El II, 545 U.S. at 240 (quoting Miller-El v. 
Cockrell, 537 U.S. at 340); see also United States v. Williamson, 
533 F.3d 269, 274 (5th Cir. 2008) (noting that, although “‘[t]he trial court has 
a pivotal role in evaluating Batson claims,’ . . . we are also cognizant 
that the Supreme Court has made plain that appellate review of alleged 
Batson errors is not a hollow act”) (quoting Snyder v. Louisiana, 
552 U.S. ___, ___, (2008)). We now turn to an analysis of “all relevant 
circumstances.”
V 
Analysis
A
Statistical 
Disparity
 
            
Here, as in Miller-El, the statistics are “remarkable.” Miller-El II, 545 U.S. at 240 (noting that prosecutors 
used peremptory strikes to exclude 91% of eligible black venire members). 
Jurors were chosen from the first twenty-eight members of the venire. At the 
conclusion of the parties’ questioning, four panelists were struck for cause or 
by agreement, and the parties then submitted their peremptory challenges. Fisk 
struck five of the six African Americans (83%) but only one (5.5%) of the 
eligible nonblack prospective jurors,[5] and “[h]appenstance is unlikely to produce this disparity.”[6] Miller-El I, 537 
U.S. at 342. 
B
Comparative Juror 
Analysis
 
            
Beyond the raw statistics, a comparative juror analysis is similarly 
troubling. Fisk struck Juror No. 12, Patrick Daigle, and provided the following 
explanation:
 
Of all the 
jurors, juror No. 12, who initially I thought would be good a good [sic] juror 
for us, reacted that corporations should be punished with the use of punitive 
damages. He was the most clear on that subject. In 
addition, I attempted to draw out of him a discussion from him about his 
involvement in this management-employee committee thing at Continental, 
something that would make me think he recognized that many of the discrimination 
claims that they deal with — I know he said he didn’t have any personal 
involvement with race discrimination cases; but he seemed to be too ready to 
believe that Continental has discriminatory employment practices; which, you 
know, I could be totally wrong about this, Your Honor; but my belief is that I 
tend to have a high degree of skepticism about that, about Continental and the 
fact that he didn’t have that same skepticism caused me to believe they we 
should exercise a challenge on him. 
 
The trial 
court then immediately overruled Davis’s Batson objection to the strike. 

            
Davis’s 
counsel conducted the only questioning on punitive damages, and, as is evident 
from the colloquy,[7] Daigle never verbally responded to the 
questions about punitive damages. Fisk nonetheless asserted in the trial court 
that Daigle nonverbally “reacted that corporations should be punished with the 
use of punitive damages.” Fisk did not elaborate on the type of nonverbal 
conduct that Daigle manifested, other than to say Daigle was “most clear” on the subject. Davis’s counsel objected that “the nonverbal 
cues that Defense Counsel has cited throughout are not supported by the record” 
and also noted that Fisk never attempted to question Daigle about any alleged 
“nonverbal cues.”[8] 
            
Last term, the Supreme Court decided a Batson case involving 
nonverbal conduct. In Snyder v. Louisiana, the Court held that the 
prosecution improperly struck a potential juror. Snyder, 552 
U.S. at ___. The prosecution gave two 
reasons for its strike, one of which was that Brooks, the potential juror, 
looked “very nervous” throughout the questioning. Id. at 
___. The Court noted that the “record [did] not show that the trial judge 
actually made a determination concerning Mr. Brooks' demeanor.” Id. at 
___. Absent such a finding, the Court concluded that it could not 
“presume that the trial judge credited the prosecutor's assertion that Mr. 
Brooks was nervous.” Id. Thus, while “deference [to the 
trial court] is especially appropriate where a trial judge has made a finding 
that an attorney credibly relied on demeanor in exercising a strike,” id. 
at ___, here there was no such finding, and we cannot 
presume the trial court credited Fisk’s explanation. 
            
Additionally, the lack of further detail about Daigle’s purported 
reaction, Fisk’s failure to question Daigle about it, and the failure to strike 
a white juror who expressed verbally what Daigle purportedly did nonverbally, 
give us pause. Peremptory strikes may legitimately be based on nonverbal 
conduct, but permitting strikes based on an assertion that nefarious conduct 
“happened,” without identifying its nature and without any additional record 
support, would strip Batson of meaning. Opposing counsel must have an 
opportunity to rebut the accusation, the trial court must be enabled to decide 
whether the charge accurately describes what happened during voir dire, and the appellate court must have a record on 
which to base its analysis. Verification of the occurrence may come from the 
bench if the court observed it; it may be proved by the juror’s acknowledgement; 
or, it may be otherwise borne out by the record as, for example, by the detailed 
explanations of counsel. We do not think Snyder excludes sources of 
verification other than an explicit trial court finding. See, e.g., People v. 
Davis, 78 Cal. Rptr.3d 809, 817 (Cal. Ct. App. 2008) (Snyder did not 
require reversal based on demeanor-related strike even though trial court did 
not make an explicit finding as to demeanor, as juror’s “demeanor [was] shown on 
the record from her lateness and inability to follow the court's instructions” 
and thus “[n]o further finding was needed”). The point, instead, is that the 
communication be proved and reflected in an appellate record, and counsel must, 
therefore, identify that conduct with some specificity. 
            
Nonverbal conduct or demeanor, often elusive and always subject to 
interpretation, may well mask a race-based strike. For that reason, trial courts 
must carefully examine such rationales. Our sister court which, as we have 
noted, has a much more developed Batson jurisprudence than we do, see 
Goode, 943 S.W.2d at 450,[9] has held that a prosecutor’s statements 
that he didn’t like a venireman’s “attitude, his 
demeanor” were pretextual when his verbal answers 
failed to show hostility, and the prosecutor “never mentioned any specific body 
language, or any other non-verbal actions which led him to believe the venireman was biased against his case.”[10] Hill v. State, 827 S.W.2d 860, 
869-70 (Tex. Crim. App. 1992) (noting that “the record 
speaks for itself”); accord Brown v. Kelly, 973 F.2d 116, 121 (2d Cir. 
1992) (noting that demeanor-related reasons may be legitimate basis for 
peremptory challenge “if they are sufficiently specific to provide a basis upon 
which to evaluate their legitimacy”); Mack v. Anderson, 861 N.E.2d 280, 
297 (Ill. App. Ct. 2006) (noting that “conduct and demeanor must be given close 
scrutiny because such perceptions may easily be used as a pretext for 
discrimination” and, because attorney “did not make a record by providing a 
clear and reasonably specific explanation of what he perceived to be” the struck 
juror’s “disinterest,” the record failed to support the race neutral explanation 
given); Zakour v. UT Med. Group, Inc., 
215 S.W.3d 763, 774-75 (Tenn. 2007) (holding that “to avoid a Batson 
violation, it is important that counsel specifically state the particular body 
language that forms the basis for the peremptory challenge”; lawyer’s 
identification of body language must be “sufficiently specific to provide a 
basis upon which to evaluate [its] legitimacy,” and “body mechanics” was not 
detailed enough to survive Batson objection) (citation omitted); see 
also Blades v. Miller, 261 F. App’x 314, 315-16 
(2d Cir. 2008) (affirming trial court’s acceptance of specific body language, 
including crossed arms, as a race-neutral explanation, as well as trial court’s 
rejection of strike based on “body language in a formulaic, non-specific way”), 
cert. denied, ___ U.S. ___ (2008). Batson requires a “clear and 
reasonably specific explanation” of the legitimate reasons for a strike, 
Batson, 476 U.S. at 98 
n.20 (quoting Tex. Dep’t of Community Affairs v. Burdine, 450 U.S. 248, 258 (1981)), and merely 
stating that a juror nonverbally “reacted” is insufficient. 
            
Fisk’s failure to question Daigle about his purported reaction also 
suggests that Daigle’s reaction had little to do with Fisk’s strike. 
Miller-El II, 545 U.S. at 246 (noting that the prosecution’s failure to 
question prospective juror about reason given for strike suggested pretext; 
prosecutor “probably would have [questioned him] if the family history had 
actually mattered”) (citing Ex parte Travis, 
776 So.2d 874, 881 (Ala. 2000) (“[T]he State’s failure to engage in any 
meaningful voir dire examination on a subject the 
State alleges it is concerned about is evidence suggesting that the explanation 
is a sham and a pretext for discrimination.”)); Alex v. Rayne Concrete Serv., 951 So.2d 138, 154 (La. 2007) (noting that “the 
lack of questioning or mere cursory questioning before excluding a juror 
peremptorily is evidence” of pretext). Moreover, Fisk did not strike Vinzant, a white juror who stated that he would not have a 
problem awarding punitive damages. See Miller-El II, 
545 U.S. at 248 (holding that evidence of 
pretext exists if a reason applies equally to other panel members, who were not 
minorities and not struck). These factors suggest that 
the stated reason—Daigle’s “reaction” to punitive damages—was pretextual. 
            
Thus, we turn to the remaining reason offered for striking Daigle: that 
he seemed too eager to believe that his employer, Continental Airlines, 
discriminated against employees and that he did not express sufficient 
skepticism about discrimination claims. Daigle, a seventeen-year employee of 
Continental, listed his occupation as “customer service manager” and explained 
his job as follows: 
 
Daigle:              
  It’s called aide-of-counsel. It’s just like having a union without 
the union. We’re the representative between management and the person. But every 
time we hear a case we don’t hear it from our office. We have to judge the case 
from someone else’s office. So like in this case, I don’t know either party, 
which is what we do over there; so it doesn’t give us a bias about somebody that 
we work with. We have to judge their performance and have that bias about, 
“Well, I know this individual. Can I judge fairly?” We deal with different 
offices. We have three offices, Tampa, 
Salt Lake, and Houston. So they’ll send us a case from another 
office versus here at home. 
 
Fisk 
counsel:     And by separating it out so that you don’t know 
the people, that way they’re limiting the bias that somebody might have from 
knowing the party?
 
Daigle:              
  Yes.
 
Fisk 
counsel:     Then you know exactly what we’re doing with 
this voir dire process?
 
Daigle:              
  Yes.
 
Fisk 
counsel:     Do you deal with the cases sometimes where an 
employee says they’re being discriminated against because of race?
 
Daigle:                                                  
  We deal with all of it.    
 
Fisk 
counsel:     Race?
 
Daigle:              
  Race discrimination, everything.
 
Fisk 
counsel:     And are there times when employees have said, 
“Something happened to me because of race” at Continental where the panel you 
were on agreed with that?
 
Daigle:              
  That we agreed on it?
 
Fisk 
counsel:     Right.
 
Daigle:              
  I’ve never been on a case of race myself.
 
Fisk 
counsel:     You’ve never been on a case of race 
yourself?
 
Daigle:              
  No.
 
Fisk 
counsel:     But what you do in these cases though is listen to both sides and try to determine whether there is a 
basis in fact for the belief that an adverse job determination was 
discriminatory.
 
Daigle:              
  Yes, well, have to decide whether management was right or the 
employee was right.
 
Fisk 
counsel:     Okay.
 
Daigle:              
  Either management right [sic] on their decision or the employee 
has a right to come back.
 
Fisk 
counsel:     And I do understand correctly what you’re 
telling us is there’s nothing about either that or your feelings with regard to 
a prior employment situation that makes you feel inclined to start this case, 
giving the Plaintiff a little bit of a head start?
 
Daigle:              
  No.
 
            
The court of appeals held that Fisk’s explanation for striking Daigle 
sufficed, because even though Daigle stated he could be fair, “counsel is not 
required to take all voir dire answers at face value.” 
187 S.W.3d at 585. While that is true, there is nothing 
in the voir dire record to support counsel’s 
explanation that Daigle believed Continental discriminated against 
employees—indeed, Daigle, a longtime employee, stated that leaving his old job 
for Continental was “a better move for [him],” and the only thing he said about 
race discrimination cases was that he had never been involved with one. At best, 
the record shows that Daigle was neutral about employment discrimination issues, 
providing no support for Fisk’s asserted reason for striking him. Even if Fisk were concerned about Daigle’s description of his 
aide-of-counsel position as “like having a union without the union” (a concern 
that was never expressed at trial), it does not explain why Fisk failed to 
strike (or even question) juror 27, a white woman, about her membership in a 
union.
            
On appeal, Fisk cites Daigle’s voir dire 
responses about past personal experiences with discrimination as a basis for the 
strike.[11] This reason—never advanced in the trial 
court—may not now be used to justify the strike. See, e.g., Miller-El 
II, 545 U.S. at 252 (noting that, “when illegitimate grounds like race are 
in issue, a prosecutor simply has got to state his reasons as best he can and 
stand or fall on the plausibility of the reasons he gives”); see also id. 
(noting that reason given during Batson 
hearing but after State’s initial reasons were shown to be incorrect “reeks of 
afterthought” and showed “pretextual timing”). On 
balance, we conclude that Fisk’s reasons for striking Daigle “cannot reasonably 
be accepted.” Miller-El II, 545 U.S. at 247 (citing Miller-El I, 537 
U.S. at 339 (noting that the 
credibility of reasons given can be measured by "how reasonable, or how 
improbable, the explanations are; and by whether the proffered rationale has 
some basis in accepted trial strategy")). 
            
Although the improper exclusion of even one juror is unconstitutional, 
Snyder, 552 U.S. at ___, we also find troubling 
Fisk’s strike of Michael Pickett, juror no. 5. Fisk explained its reasons for 
striking Pickett as follows: 
 
Before I 
ever came to court today, I had a problem with Juror No. 5 because he is a 
musician. And the fact that that is his only employment causes me to believe 
that he would not be a very good Defense juror in any case and certainly in this 
case where the issue is people getting laid off over job performance and things 
of that nature. Also when Juror 29 made a — I don’t remember whether it was a 
solicited or unsolicited comment about having friends of African-American race, 
he was one of the jurors who noticeably laughed at that; and it was clear from 
his reaction he did not believe that. And there were two or three other people 
who were challenged on that same basis. He also is one of the people who 
appeared to us to have the strongest reaction to this whole “N” word issue. And 
whether or not his feelings about the company, if there is testimony that one of 
the people in the company used the “N” word — you want me to keep going?
 
            
We note that Fisk never questioned Pickett about his job but instead 
relied on Pickett’s juror information card, which stated that Pickett was a 
musician employed by Pleasant 
Hill Baptist 
Church. Miller-El 
II, 545 U.S. at 244. Moreover, while facially race-neutral, this reason becomes less so 
when Pickett is compared to other jurors who were not struck. Juror No. 2 
was unemployed; Juror No. 26 had been terminated and then sued his employer to 
enforce an employment contract; Juror No. 4's husband had been laid off 
repeatedly from construction jobs, and she stated that in the last two years he 
had experienced “really bad” problems in finding new employment; Juror No. 10 
had been terminated. It is difficult to imagine that Pickett, who was employed 
and who did not respond affirmatively when Fisk inquired whether anyone had been 
terminated or when Fisk asked the panel whether, if they were involved in 
industries in which there were layoffs, they could not be fair and impartial, 
was less desirable than these jurors because of his musical career. Instead, it 
seems that the strike was “based on a group bias where the group trait is not 
shown to apply to the challenged juror specifically,” Whitsey v. State, 796 S.W.2d 707, 716 (Tex. Crim. App. 1989) (holding that prosecutor’s strike of black 
female juror because she was a teacher and teachers were “liberal,” when nothing 
in the record bore out that characterization, was “insufficient as a matter of 
law”), and suggests pretext. 
            
Another proffered reason for striking Pickett was that he reacted 
strongly when asked about the “n-word.” The anticipated trial evidence included 
testimony that Davis’s supervisor had referred to him using 
“the n-word.” Davis’s counsel mentioned this during voir dire, and Fisk’s attorney conducted follow-up 
questioning on the matter. Fisk explained its strikes of three African-American 
jurors (Pickett, Euline Edmund, and Mary Harts) in 
part based on their verbal and nonverbal responses to the n-word questioning. 
Counsel stated that Pickett was “one of the people who appeared to us to have 
the strongest reaction to this whole ‘N’ word issue”; Edmund “[o]f all of the 
people on the panel, . . . appeared to us to have the strongest feelings on the 
subject of the ‘N’ word”; and Harts was “also one of the jurors who had the 
strongest reactions to the subject use of the ‘N’ word.” 
            
But an examination of the voir dire on the 
n-word issue shows that Pickett, Edmund, and Harts were no more offended by the 
n-word than Martha Ann Stehling, Clara Reynaga, and John David Vinzant, 
three nonblack venire members who were not struck and 
who were seated on the jury.[12] While Edmund stated that she had “a real 
hard time with” Davis’s supervisor’s use of the n-word, Reynaga immediately agreed, stating “I also feel the same 
way, and we all know that words are preceded by thoughts. So even before he said 
it, those thoughts were there.” The remainder of Fisk’s questioning on the 
n-word follows:
 
Fisk 
counsel:     Okay. Anybody else who feels that way? Juror No. 5?
 
Pickett:             
Well, I have to qualify that. Depending on what the evidence was, just 
because he said that didn’t necessarily mean that was the reason he was 
terminated; but the fact that he said that is a real big problem.
 
Fisk 
counsel:     But the fact is you don’t like it, right? If he said 
it, you don’t like it?
 
Pickett:             
It’s not whether or not I like him or not.
 
Fisk 
counsel:     No, I’m not talking about him, it. You don’t like 
it, that he said it, right? Is that what you’re saying?
 
Pickett:             
Correct.
 
Fisk 
counsel:     But you would say that that’s a different question 
from how the decision was made and why the Plaintiff was discharged, and you 
would listen to that evidence?
 
Pickett:             
If the evidence pointed to that, it is possible to make that kind of a 
decision.
 
Fisk 
counsel:     And Juror No. 3., Ms. Reynaga, do you agree with that?
 
Reynaga:          
Yes.
 
Fisk 
counsel:     Anybody else who feels like they couldn’t, based on 
what they’ve heard so far, listen to the Court’s instructions, follow the 
Court’s instructions? Juror No. 26, you were raising your card there?
 
Vinzant:            
I mean, I agree. I can listen and follow the Court’s instructions, but 
the way you’ve been saying it, that the company has a problem with people using 
that word, to me that’s a cultural management company problem. I don’t know that 
people’s roles — and I’m sure that will come out in evidence. But if it’s a 
systemic cultural problem with the company, am I going to be predisposed one way 
or the other? I am.
 
Fisk 
counsel:     If you find out that that is a cultural systemic 
problem in the company and that there are a bunch of people besides Mr. Blanton 
who are alleged to have said that and you hear that evidence, that’s going to be 
important evidence to you, is what you’re saying?
 
Vinzant:            
Extremely important.
 
Fisk 
counsel:     Number one, y’all know I’m not and neither is 
counsel for the Plaintiff, giving you the evidence in this case. You’ll hear the 
evidence from the witness stand. Everybody understands that, right? And then, 
number two, I think it’s significant at this point for me to say that Mr. 
Blanton doesn’t work for this company anymore. He’s going to testify. But I want 
to get it back on track here a second, okay, because I said this a minute ago: I 
don’t think whether — now, listen to me here. I’m going to remind you of this: 
In closing arguments I’ll say this again. I don’t think whether Mr. Blanton is a 
raving racist or not — and I don’t think he is — but if he is, I don’t think it 
has anything to do with the discharge decision in this case. And that’s because 
I think when you hear all of the evidence — in fact, things I’m not sure Ms. 
Jain even knows right now — you’ll realize when you hear how the decision was 
made and now just how, who made the decision, then you’re going to realize we’re 
in a smoke screen here. Okay. Juror No. 25?
 
Stehling:            
I think you’ve already prejudiced — you’re making us question the 
credibility of your witness already.
 
Fisk 
counsel:     You’re talking about Mr. Blanton?
 
Stehling:            
Yes.
 
Fisk 
counsel:     Well, that’s a fair comment. Why do you feel that 
way? 
 
Stehling:            
Because you’ve already presented this information about what’s happened. 
It’s inappropriate.
 
Fisk 
counsel:     It was inappropriate to say that he said the “N” 
word? 
 
Stehling:            
Well, we’re going to have to keep hearing about someone using the “N” 
word.
 
Fisk 
counsel:     Well, actually what I believe the testimony was 
was that after the discharge decision was made Mr. 
Blanton was having a conversation with someone where he said basically, “We’re 
going to do this. We’re going to have to be careful how we do it because he’s an 
‘N’ person.” Now, that’s based on testimony that was given.
 
Stehling:            
I don’t think you made a good impression of the credibility of your 
witness.
 
 
            
Fisk struck the three African-American venire members who participated in 
this colloquy but not their white and Hispanic counterparts, who responded at 
least as strongly to the n-word issue. Fisk’s stated reasons for the strikes 
included the venire members’ reactions to the n-word issue. “The fact that [a 
given] reason also applied to these other panel members, most of them white, 
none of them struck, is evidence of pretext.”[13] Miller-El II, 545 U.S. at 248; 
see also United States v. Huey, 76 F.3d 638, 641-42 (5th Cir. 1996) 
(holding that defendant’s assumption that minority jurors would be biased after 
hearing racial slurs on tape recordings was “nothing more than an assumption of 
partiality based on race and a form of racial stereotyping, both of which have 
been repeatedly condemned”; excluding minority venire members on that basis 
violated Batson). Pickett’s “strong reaction” in the form of his verbal 
responses to Fisk’s questions was no stronger than some of his nonblack counterparts, and Fisk’s strike on this basis 
suggests pretext. 
            
The final reason given for striking Pickett was that he laughed when 
Juror 29 said he had African American friends. Davis disagrees that Pickett’s laughter was 
based on that statement but instead asserts that it was in response to Juror 
29's joke about a friend who was more successful than he. Even assuming Fisk’s 
explanation was correct, Fisk also claimed to have challenged two or three other 
venire members for the same reason. But, in fact, Fisk cited laughter as a basis 
for striking only one other venire member, also African American. And Fisk never 
questioned Pickett about his laughter, another indication that this reason may 
be pretextual, as more fully explained above. While 
Pickett’s laughter appears at first blush to be a plausible, race-neutral reason 
for striking him, when we examine the totality of the circumstances (including 
Fisk’s strike of Daigle),[14] we cannot agree that Pickett’s race was 
irrelevant. Powers, 813 S.W.2d at 491 (holding that equal protection is 
denied if “race is a factor” in a peremptory challenge).
            
In concluding that Fisk’s reasons for striking Pickett were non-pretextual, the court of appeals erroneously relied on 
Pickett’s statements during voir dire that he had been 
the victim of racial discrimination. 187 S.W.3d at 
582-83. While Pickett did make such an assertion, Fisk did not cite 
Pickett’s experience with discrimination as a basis for the strike. Thus, the 
court of appeals should not have relied upon these statements as supporting 
Pickett’s strike. See Miller-El II, 545 U.S. at 252 (lawyer must “state 
his reasons as best he can and stand or fall on the plausibility of the reasons 
he gives”; if stated reason does not hold up, it is immaterial that “an appeals 
court can imagine a reason that might not have shown up as false”). In sum, none 
of Fisk’s reasons for striking Pickett can “reasonably be accepted.” 
Miller-El II, 545 U.S. at 247. 
VI
Conclusion
 
            
Despite its laudable goal, Batson has been difficult to enforce. 
In Miller-El II, decided a year after this case was tried, the Supreme 
Court noted that Batson’s “individualized focus came with a weakness of 
its own owing to its very emphasis on the particular reasons a prosecutor might 
give.” Miller-El II, 545 U.S. at 239-40.
 
If any 
facially neutral reason sufficed to answer a Batson challenge, then 
Batson would not amount to much more than Swain. Some stated 
reasons are false, and although some false reasons are shown up within the four 
corners of a given case, sometimes a court may not be sure unless it looks 
beyond the case at hand. Hence, Batson’s explanation 
that a defendant may rely on ‘all relevant circumstances’ to raise an inference 
of purposeful discrimination.
 
Id. at 
240 (quoting Batson, 476 U.S. at 96-97). Miller-El 
II’s 
“totality of the circumstances” analysis places a heavy burden on trial courts, 
and we acknowledge that some of the factors that Court examined—most especially 
the comparative juror analysis—are perhaps more easily reviewed on appeal, with 
the benefit of a transcript from which such comparisons may most accurately be 
drawn. But without Miller-El II’s searching inquiry into the basis 
of the challenged strikes, Batson would become a “mere exercise in 
thinking up any rational basis.” Id. at 
25.
            
Unlike Miller-El II, there is no evidence here of a historical 
pattern of excluding blacks from juries. But Miller-El II made it clear 
that the five factors it considered were neither exhaustive nor mandatory; 
courts must consider “all relevant circumstances” when reviewing Batson 
challenges. Miller-El II, 545 U.S. at 240 (quoting Batson, 476 
U.S. at 96-97); see also Snyder, 552 U.S. at ___ (“In Miller-El v. 
Dretke, the Court made it clear that in 
considering a Batson objection, or in reviewing a ruling claimed to be 
Batson error, all of the circumstances . . . must be consulted.”). And 
here, the relevant circumstances include many of those pertinent in 
Miller-El II, including a statistical disparity and unequal 
treatment of comparable jurors. 
            
We acknowledge that peremptory strikes, often based on instinct rather 
than reason, can be difficult to justify. Miller-El II, 545 
U.S. at 252. The trial lawyer’s 
failure to do so here does not suggest personal racial animosity on his part. 
See, e.g., Antony Page, Batson’s Blind Spot: 
Unconscious Stereotyping and the Peremptory Challenge, 85 B.U. L. Rev. 155, 160-61, 184 (2005) 
(noting that “research has compellingly demonstrated the existence of 
unconscious race- and gender-based stereotyping”). A zealous advocate will seek 
jurors favorably inclined to his client’s position, and race may even serve as a 
rough proxy for partiality. See, e.g., Batson v. Kentucky, 476 
U.S. 79, 139 (1986) (Rehnquist, J., 
dissenting) (noting that factors like race are often a “proxy” for potential 
juror bias). But whatever the strategic advantages of that practice, the 
Constitution forbids it. 
            
The concurrence suggests that we ascribe sinister motives to Fisk’s 
counsel. The question presented, however, is not whether this particular 
advocate harbors ill will, but whether the record explains, on neutral grounds, 
a statistically significant exclusion of black jurors. It is not enough, under 
the Supreme Court precedent we examine here, that the lawyer be pure of heart. 
We assume that he is. Our holding depends not on the personal sentiments of the 
advocate but on the state of the record. Miller-El II and Snyder 
emphasize that Batson’s promise cannot be fulfilled if its requirements 
may be satisfied merely by ticking off a race-neutral explanation from a 
checklist. 
            
After examining the totality of the circumstances, we conclude that race 
explains Fisk’s strikes of Daigle and Pickett better than any other reason, and 
the trial court abused its discretion in failing to sustain Davis’s Batson 
challenge. Miller-El II, 545 U.S. at 266; Powers, 813 S.W.2d at 491. We reverse in part[15] the court of appeals’ judgment and 
remand the case to the trial court for a new trial. Tex. R. App. P. 60.2(d). 
            
            
            
            
            

            
___________________________
            
Wallace B. Jefferson 
            
            
            
            
            
            
            
            
            
Chief Justice 
 
OPINION 
DELIVERED:     September 26, 2008                 
            
            
     
            

 
 






[1] 
Davis sued Fisk 
Electric Company, Fisk Technologies, and Fisk Management Inc. For simplicity, we 
refer to respondents simply as “Fisk.” 

[2] 
In Edmonson v. Leesville Concrete Co., Inc., 500 
U.S. 614, 616 (1991), the Supreme 
Court extended Batson’s prohibition on race-based strikes to civil cases. 
In Powers v. Palacios, 813 S.W.2d 489, 491 (Tex. 1991), we followed 
Edmonson and held that “equal protection is denied when race is a factor 
in counsel's exercise of a peremptory challenge to a prospective juror.” For 
ease of reference, we will refer to the challenge raised in this case as simply 
a Batson challenge.

[3] 
See Elaine A. Carlson, Batson, J.E.B., and Beyond: The 
Paradoxical Quest for Reasoned Peremptory Strikes in the Jury Selection 
Process, 46 Baylor L. Rev. 
947, 981 (1994). 

[4] 
As we have noted:
At the first step of the process, the opponent of the 
peremptory challenge must establish a prima facie case of racial discrimination. 
. . . During the second step of the process, the burden shifts to the party who 
has exercised the strike to come forward with a race-neutral explanation. . . . 
It is not until the third step that the persuasiveness of the justification for 
the challenge becomes relevant. At the third step of the process, the trial 
court must determine if the party challenging the strike has proven purposeful 
racial discrimination, and the trial court may believe or not believe the 
explanation offered by the party who exercised the peremptory challenge. It is 
at this stage that implausible justifications for striking potential jurors “may 
(and probably will) be found [by the trial court] to be pretexts for purposeful 
discrimination.” Nevertheless, the Supreme Court has emphasized that “the 
ultimate burden of persuasion regarding racial motivation rests with, and never 
shifts from, the opponent of the [peremptory] strike.”
                
                
                
                
                
    
Goode, 943 S.W.2d at 445-46 (citations 
omitted).

[5] 
Fisk used its sixth strike to remove a venire member of Asian descent. Davis initially included 
this juror within the Batson challenge but later abandoned the claim. We 
note, however, that Davis could have challenged this juror’s 
exclusion as well, even though he and the venire member were not the same race. 
Powers v. Ohio, 499 U.S. 400, 402 (1991) (holding that a 
defendant may object to race-based peremptory challenges whether or not he and 
the excluded juror share the same race).

[6] 
The concurrence’s focus on Davis’s strikes misses the mark, 
as they do not answer whether Fisk’s strikes were improperly based on 
race. Cf. Miller-El II, 545 U.S. at 255 n.14 (criticizing the 
Fifth Circuit for declining to give much weight to the evidence of racially 
motivated jury shuffles because Miller-El had shuffled the jury five times and 
prosecutors shuffled only twice: “Miller-El’s shuffles are flatly irrelevant to 
whether prosecutors’ shuffles revealed a desire to exclude blacks.”).

[7] 
The entire exchange consisted of the following:
 
Davis counsel:      Does anybody 
here feel that punitive damages do what they’re meant to do, punish the person 
and stop the person from doing the same thing again? That’s what punitive 
damages are. Do people think that in certain cases punitive damages should be 
awarded? Do you think that punitive damages is 
something that always compensates a victim? You feel that? Let’s have you hold 
up your card, and I want everybody who feels that punitive damages always 
compensates a victim. Juror No. 26 [Vinzant], 13 [Parker], 7 [Johnson].
 
Donaldson: 
          I have to qualify 
that.
 
Prescott:                
    I’ll qualify my answer.
 
Davis counsel:      I’d like your 
qualifications.
 
Donaldson: 
          It depends on the 
amount.
 
Davis counsel:      I can’t see. Can you 
hold it up, please? 47? My eyes are getting bad with old age. 44. All right. 
Juror No. 35, what’s your qualification?
 
Donaldson:           
I’m just saying that there is a dollar limit. I mean, we’re talking reasonable 
sums of money here.
 
Davis counsel:      Yes.
 
Donaldson: 
          That’s fine. If we’re 
talking about $80 million, okay, that’s absurd.
 
Davis counsel:      Would the 
reasonableness of the sum, would you agree with me, depends upon the 
facts?
 
Donaldson: 
          Yes.
 
Davis counsel:      And y’all understand 
that with every question I’m asking you the judge is going to give you the 
instructions very specifically on every aspect of the question that I’ve asked 
in this case; and all you’ll have to do is follow the law, right? Juror No. 26, 
will you have a problem with awarding punitive damages?
 
Vinzant: No, but I think the amount of punitive damages 
required to punish a company is often not the same as should be awarded to the 
individual. It’s a different scale.
 
Davis counsel:      Juror No. 13, you’re 
opposed to punitive damages?
 
Parker:                    
        Yes.
 
Davis counsel:      Juror No. 26? I’ve 
already talked to you, sorry. 47? What was your opinion on the punitive damage 
question? You said that they overcompensated—
Prescott:                
    If it’s an absurd amount, it would be 
overcompensated.
 
Davis counsel:      And Juror No. 44, you 
said you would qualify your answer too, correct? And does the qualification 
depend on the facts, depends on the amount?
 
Prescott:                
    Yes. 
 

[8] 
The concurrence’s statement that “no one denied at trial, or denies even today, 
that the struck jurors reacted just as Fisk’s counsel said they did” unfairly 
narrows Davis’s 
objection that the nonverbal conduct was “not supported by the 
record.”

[9] 
Some research suggests that over 94% of Batson complaints occur in 
criminal cases. See Kenneth J. Melilli, Batson in 
Practice: What We Have Learned About Batson and Peremptory 
Challenges, 71 Notre Dame L. Rev. 
447, 458 (1995).

[10] In a later case, the Court of Criminal 
Appeals found the following “demeanor” explanation to be sufficiently specific 
to survive a Batson challenge: 
Prosecutor:            
Mr. Martinez, quite frankly, Judge, the notes I put down when I got 
through talking to him was he has poor facial expressions. He's very 
inattentive, looks unhappy to be here, body language, posture was such that just 
made him feel he was uncomfortable. The only way I can characterize it is he had 
a very long, unhappy face, mouth down-turned at the corners, eyes downcast. And 
he was, quite frankly, that way not only to the State, but when being addressed 
by Defense Counsel.
My feelings were is that [sic] he just wasn't -- didn't 
want to be here, wasn't happy to be here, and I just felt like he was an unknown 
quantity rather than risk having an unhappy person on the jury or somebody that 
didn't respond readily to questions that were asked, would be to strike him, 
Judge.
Yarborough v. State, 947 S.W.2d 892, 893, 896 (Tex. Crim. App. 1997).

[11] The court of appeals noted this “completely 
new” reason but did not reach the question of whether Fisk could rely on that 
reason, as that court concluded that the reasons advanced at trial justified the 
strike. 187 S.W.3d at 585 n.3. 

[12] Indeed, it would be surprising if venire 
members did not react to what is, particularly in this day and age, a 
universally offensive epithet.

[13] This is nowhere more obvious than in Fisk’s 
strike of Harts, based in part on Fisk’s claim that she was “one of the jurors 
who had the strongest reactions to the subject of the use of the ‘N’ word.” In 
fact, Harts never verbally responded to any of the questions regarding the 
n-word, including Fisk’s direct questions about whether Blanton’s use of the 
n-word would impact the venire’s consideration of the evidence. To the extent 
Fisk is relying on nonverbal conduct, merely stating that Harts had a strong 
“reaction” to the n-word is insufficient, for the reasons outlined above. 


[14] See Snyder, 552 U.S. at ___ 
(noting that “all of the circumstances that bear upon the issue of racial 
animosity must be consulted,” and “if there [are] persisting doubts as to the 
outcome, a court would be required to consider the strike of [one challenged 
juror] for the bearing it might have upon the strike of [another]”)

[15] In the trial court, Davis unsuccessfully moved 
for sanctions against Fisk, and the court of appeals affirmed the trial court’s 
order. Davis 
does not challenge that portion of the court of appeals’ judgment.